## STATE OF CONNECTICUT *v.* MARLIK MOURNING
### (SC 15913)

Borden, Berdon, Norcott, Katz and Palmer, Js.

Argued January 20—officially released June 8, 1999

*Nancy Burton*, for the appellant (defendant).

*Eileen McCarthy Geel*, deputy assistant state's attorney, with whom were *Robert C. Brunetti*, assistant state's attorney, and, on the brief, *Walter Flanagan*, assistant state's attorney, for the appellee (state).

*Opinion*

PALMER, J. In this certified appeal, the defendant, Marlik Mourning, claims that the Appellate Court improperly affirmed the judgment of the trial court revoking his probation and sentencing him to serve his previously suspended three year prison sentence. We conclude that the dispositional phase of the defendant's probation revocation hearing was flawed because the defendant was not permitted personally to address the court at that phase of the hearing. Consequently, we reverse the judgment of the Appellate Court in part and direct that court to remand the case to another trial court for a new dispositional hearing at which the defendant will have the right of allocution.[1]

---

[1] On January 25, 1999, five days after oral argument in this appeal, we granted the defendant a new dispositional hearing. Because the defendant already had served over 800 days of his three year sentence as of that date, we immediately issued a per curiam decision reversing the judgment of the Appellate Court and remanding the case to that court with direction to: (1) reverse the judgment of the trial court in part; and (2) remand the case to the trial court for a new dispositional hearing. *State* v. *Mourning*, 247 Conn. 634, 635, 723 A.2d 316 (1999). We also indicated that this opinion, which more fully explains our reasons for reversing the judgment of the Appellate Court, would be released subsequently. Id.

The relevant facts are undisputed. After a trial to the court, the defendant was adjudicated a youthful offender[2] by having committed the crime of sexual assault in the third degree in violation of General Statutes § 53a-72a.[3] On January 30, 1996, the court sentenced him to a term of imprisonment of three years, execution suspended, and three years probation. Among other things, the conditions of the defendant's probation required him to return to school full-time, attend school every day except in the event of an excused absence for illness, arrive at school on time and pass all of his courses to the extent that he was capable of doing so. At the time of sentencing, the trial court was aware that, during the previous school year, the defendant had been absent from school sixty days and tardy fifty-nine days. The defendant also had been suspended five times for his truancy, and once for fighting. Finally, the trial court also was aware that the defendant twice had been adjudicated a juvenile delinquent, that he had failed to complete successfully an alternative incarceration program and that he used illicit drugs.[4]

On April 1, 1996, the defendant's school apprised the defendant's probation officer that, during the month of March, 1996, the defendant twice had been absent from school without a bona fide excuse, had been tardy twelve times,[5] had been suspended once for leaving the

[2] See General Statutes § 54-76b et seq.

[3] General Statutes § 53a-72a provides in relevant part: "Sexual assault in the third degree . . . (a) A person is guilty of sexual assault in the third degree when such person (1) compels another person to submit to sexual contact (A) by the use of force against such other person or a third person, or (B) by the threat of use of force against such other person or against a third person, which reasonably causes such other person to fear physical injury to himself or herself or a third person . . . ."

[4] The defendant also was required, as a condition of his probation, to undergo random urine testing due to his illegal drug use.

[5] The report submitted to the defendant's probation officer by the school indicated that there were twenty-two days in the month of March when school was open and the defendant was expected to be in attendance.

school grounds without authorization and, due to lack of effort, was failing to achieve credit for academic courses. On the basis of this report, the defendant's probation officer applied for and received a warrant, charging the defendant with violating the conditions of his probation. See General Statutes (Rev. to 1995) § 53a-32.[6] On May 9, 1996, the defendant was arrested pursuant to the warrant.

A probation revocation hearing was conducted on October 17, 1996. Immediately prior to the evidentiary portion of that hearing, counsel for the defendant sought a continuance of the hearing so that a psychiatric evaluation of the defendant, which had been initiated several days earlier, could be completed. The trial court,[7] noting that the hearing already had been scheduled and postponed eleven times, denied the defen-

---

[6] General Statutes (Rev. to 1995) § 53a-32 provides in relevant part: "Violation of probation or conditional discharge: Arrest; procedure. (a) At any time during the period of probation or conditional discharge, the court or any judge thereof may issue a warrant for the arrest of a defendant for violation of any of the conditions of probation or conditional discharge . . . . Any probation officer may arrest any defendant on probation without a warrant or may deputize any other officer with power to arrest to do so by giving him a written statement setting forth that the defendant has, in the judgment of the probation officer, violated the conditions of his probation. . . . Thereupon, or upon an arrest by warrant as herein provided, the court shall cause the defendant to be brought before it without unnecessary delay for a hearing on the violation charges. At such hearing the defendant shall be informed of the manner in which he is alleged to have violated the conditions of his probation or conditional discharge, shall be advised by the court that he has the right to retain counsel and, if indigent, shall be entitled to the services of the public defender, and shall have the right to cross-examine witnesses and to present evidence in his own behalf.

"(b) If such violation is established, the court may continue or revoke the sentence of probation or conditional discharge or modify or enlarge the conditions, and, if such sentence is revoked, require the defendant to serve the sentence imposed or impose any lesser sentence. No such revocation shall be ordered, except upon consideration of the whole record and unless such violation is established by reliable and probative evidence."

[7] The probation revocation hearing was held before the same trial judge who had adjudicated the defendant a youthful offender and imposed the suspended three year prison sentence.

dant's request. The state then presented the testimony of the defendant's probation officer establishing that the defendant had been fully apprised of the conditions of his probation, and that he had understood them. The state also adduced evidence showing that, during the month of March, 1996, the defendant twice had been absent from school without justification, had been tardy twelve times and had been suspended once.

The defendant, who testified in his own behalf, did not contest the state's evidence. Rather, he emphasized that, although he frequently had been tardy, he had been absent from school only two days during the relevant time period. He also testified that he had been ill with the flu on those two days, and that he merely had failed to report his illness until his return to school. Finally, the defendant testified that his suspension was due to the fact that, on one occasion, he had unwittingly violated a school policy by leaving school grounds to buy a soda while school was still in session.

At the conclusion of the testimony, the state argued that the defendant's repeated tardiness constituted a violation of the conditions of his probation.[8] Defense counsel maintained that, because the defendant had a problem with oversleeping, his tardiness was not wilful and, consequently, the defendant's conduct did not warrant a finding of a violation. The court, noting that the defendant already had been given "every opportunity" to change his behavior, concluded that the defendant wilfully violated the conditions of his probation. The court then revoked the order of probation and sentenced the defendant to the previously suspended three year term of imprisonment.

---

[8] Although the state, in closing argument, directed the court's attention specifically to the defendant's repeated tardiness, the state also relied on the defendant's unexcused absences and suspension from school to support its claim that the defendant had violated the conditions of his probation.

Defense counsel immediately objected to the trial court's imposition of sentence on the ground that she had not been afforded the opportunity to be heard at the dispositional phase of the hearing. With the permission of the trial court, defense counsel then argued that a continuance of the dispositional phase of the hearing was necessary so that the defendant's psychiatric evaluation could be completed.[9] After defense counsel had completed her argument, the court rendered judgment revoking the defendant's probation and sentencing him to serve the three year term of incarceration that previously had been suspended. Before the defendant had been removed from the courtroom, however, he made several requests personally to address the court.[10] The court rejected the defendant's requests, stating that the hearing had been concluded.

The defendant appealed from the trial court's judgment to the Appellate Court, which, in a per curiam opinion, summarily affirmed the judgment of the trial court. *State* v. *Mourning*, 47 Conn. App. 916, 703 A.2d 1194 (1997). We granted the defendant's petition for certification, limited to the following issue: "Under the circumstances of this case, did the trial court abuse its discretion by revoking the defendant's probation of a conviction as a youthful offender and by sentencing the defendant to imprisonment?" *State* v. *Mourning*, 244 Conn. 924, 714 A.2d 11 (1998). We conclude that the trial court properly found the defendant in violation

[9] Defense counsel also indicated that she needed the additional time to find a suitable residential placement for the defendant.

[10] Immediately after the trial court had imposed sentence and remanded the defendant to custody, the defendant asked: "Your Honor, can I please talk to you?" Shortly thereafter, the defendant again tried to get the court's attention, but was interrupted by his mother, who insisted upon addressing the court—sometimes in wholly inappropriate terms—even after the sentence had been imposed. Finally, before the sheriff removed the defendant from the courtroom, the defendant once again stated: "Your Honor, can I please talk to you, please? Talk to me, please? I want to talk to you—"

of the conditions of his probation. We also conclude, however, that the defendant is entitled to a new dispositional hearing because the court improperly failed to afford him the opportunity personally to address the court at the dispositional phase of the probation revocation hearing.[11]

I

The defendant first contends that the trial court improperly found a violation of the conditions of probation. In particular, the defendant claims that: (1) the trial court unduly limited his right to present evidence by rejecting his request for a continuance at the dispositional phase of the probation revocation hearing until completion of the psychiatric evaluation; and (2) the defendant's tardiness was not wilful and, moreover, his overall attendance record had improved markedly since his adjudication as a youthful offender. These claims, which require little discussion, are meritless.

With respect to the defendant's contention that he was entitled to a continuance of the hearing so that the psychiatric evaluation could be completed,[12] the

[11] As we have stated, "a probation revocation hearing has two distinct components. . . . The trial court must first conduct an adversarial evidentiary hearing to determine whether the defendant has in fact violated a condition of probation. . . . If the . . . court determines that the evidence has established a violation of a condition of probation, then it proceeds to the second component of probation revocation, the determination of whether the defendant's probationary status should be revoked. On the basis of its consideration of 'the whole record,' the trial court 'may continue or revoke the sentence of probation or conditional discharge or modify or enlarge the conditions, and, if such sentence is revoked, require the defendant to serve the sentence imposed or impose any lesser sentence.' General Statutes § 53-32 (b). In making this second determination, the trial court is vested with broad discretion. State v. Smith, 207 Conn. 152, 167, 540 A.2d 679 (1988) . . . ." (Citation omitted.) State v. Davis, 229 Conn. 285, 289–90, 641 A.2d 370 (1994).

[12] The psychiatric evaluation was not completed by October 17, 1996, the date of the probation revocation hearing, even though the defendant had been arrested for allegedly violating the conditions of his probation on May 9, 1996.

defendant has made no showing—indeed, he has made no claim—that he suffered from any psychiatric or other mental condition that might have affected his ability to be at school on time. Because the defendant's repeated tardiness provided a sufficient basis for the court's finding that he had violated the conditions of his probation, the defendant has failed to demonstrate how the psychiatric evaluation possibly could have had any bearing on the court's finding of a violation.

With regard to the defendant's second claim, the record supports the trial court's determination that the state had demonstrated, by a preponderance of the evidence,[13] that the defendant wilfully violated the condition of his probation requiring him to be punctual in his school attendance. The evidence indicated that the defendant was late for school more than 50 percent of the time class was in session during the month of March, 1996. The evidence adduced at the hearing also established that the defendant understood that, as a condition of his probation, he was not to be tardy. There is nothing in the record to indicate, however, that he had taken reasonable steps to avoid being tardy, such as using an alarm clock.[14] Under the circumstances, therefore, it cannot reasonably be maintained that the evidence was insufficient to establish, by a preponderance of the evidence, that the defendant's repeated tardiness constituted a wilful violation of his probation.

The defendant further contends that, in light of his improved overall attendance record, the trial court's

[13] The state has the burden of establishing a violation of the conditions of probation by a fair preponderance of the evidence. *State* v. *Davis*, 229 Conn. 285, 295, 641 A.2d 370 (1994).

[14] The defendant testified that he did not have an alarm clock. He gave no reason, however, for not obtaining one.

determination that he had violated a condition of his probation by being tardy was unfair and unjustified. The defendant, however, ignores the fact that his probation was conditioned expressly on the requirement that he arrive at school on time, not just that he attend school.[15] Moreover, the defendant's repeated tardiness—he was late for school more often than not in March, 1996—cannot be characterized either as an improvement or as an inconsequential or trivial breach of the probation order.[16] Because the record fully supports the trial court's determination that the defendant wilfully failed to comply with the condition of his probation requiring him to be punctual, the defendant's claim must fail.[17]

## II

The defendant next claims that he is entitled to a new dispositional hearing. Specifically, he contends that the trial court abused its discretion in denying him a continuance at the dispositional phase of the hearing so that the defendant's psychiatric evaluation could be completed. We need not address that argument in light of our determination that the defendant is entitled to a new dispositional hearing because he was denied the

---

[15] The defendant does not claim that the condition of his probation requiring that he not be tardy was unlawful or otherwise improper.

[16] We note that the trial court, when imposing sentence in connection with the defendant's third degree sexual assault conviction, indicated that the defendant needed structure in his life and expressly informed the defendant that he would be imprisoned if he did not comply strictly with the conditions of his probation. Indeed, defense counsel, who had acknowledged that the defendant's "real problem in life is his chronic tardiness, which has affected his schoolwork and family," urged the court to "[p]ut something hanging over his head that's going to force him to follow the rules."

[17] The dissent gratuitously injects the specter of racial discrimination into this case. This case is not about discrimination, and no such allegation ever has been raised by the defendant or defense counsel, either in the trial court or on appeal.

opportunity personally to address the court at the original hearing.[18]

In *State* v. *Strickland*, 243 Conn. 339, 354, 703 A.2d 109 (1997), we held that what is now Practice Book § 43-10 (3),[19] which affords criminal defendants the right personally to address the court at the time of sentencing, also applies to the dispositional phase of a probation revocation hearing. In *Strickland*, as in this case, the defendant had sought the opportunity to address the court immediately after the court had revoked his probation and imposed sentence. See *State* v. *Strickland*, supra, 342–43. The trial court denied the defendant's request to speak and, on appeal, the Appellate Court affirmed the judgment of the trial court, concluding that the defendant had no right of allocution at the dispositional phase of the hearing. Id., 343. Upon granting the defendant's petition for certification to appeal in *Strickland*, we reversed the judgment of the Appellate Court on the ground that our rules of practice provide a defendant with the right personally to address the court at the dispositional phase of a probation revocation hearing. Id., 354. This case is factually and legally indistinguishable from *Strickland*.[20] Thus, in accordance with our holding in *Strickland*, we conclude that

[18] As we indicated in our per curiam decision announcing our judgment in this case; see *State* v. *Mourning*, 247 Conn. 634, 635 n.1, 723 A.2d 316 (1999); the defendant now will have the opportunity to pursue the psychiatric evaluation if he still wishes to do so.

[19] Practice Book § 43-10, formerly § 919, provides in relevant part: "Sentencing Hearing; Procedures to Be Followed

"Before imposing a sentence or making any other disposition after the acceptance of a plea of guilty or nolo contendere or upon a verdict or finding of guilty, the judicial authority shall, upon the date previously determined for sentencing, conduct a sentencing hearing as follows . . .

"(3) The judicial authority shall allow the defendant a reasonable opportunity to make a personal statement in his or her own behalf and to present any information in mitigation of the sentence. . . ."

[20] We note that the per curiam decision of the Appellate Court in this case was issued on December 2, 1997, the very same day on which we released our decision in *Strickland*.

the defendant is entitled to a new dispositional hearing at which he will be afforded the opportunity personally to address the court.[21]

The judgment of the Appellate Court is affirmed to the extent that it affirmed the trial court's finding that the defendant violated the conditions of his probation; the judgment of the Appellate Court is reversed to the extent that it affirmed the trial court's revocation of the defendant's probation and order sentencing him to serve his previously suspended three year prison sentence, and the case is remanded to the Appellate Court with direction to remand the case to a new trial court to conduct another dispositional hearing at which the defendant is to be afforded the right of allocution.

In this opinion BORDEN, NORCOTT and KATZ, Js., concurred.

BERDON, J., concurring in part and dissenting in part. In the present case, the defendant, a sixteen year old African-American named Marlik Mourning (Marlik), was sentenced to spend three months in prison for each of twelve times that he was late for school. Just days after oral argument, we issued a unanimous per curiam opinion ordering Marlik's immediate release from prison "for reasons that [would] appear in a full opinion to be released subsequently . . . ."[1] *State* v. *Mourning,*

---

[21] It bears mention that even though this case is controlled by our holding in *Strickland,* neither party referred to that case, or raised the issue decided by that case, in their briefs or at oral argument. Although we normally would not decide an issue that has not been raised by the parties without first affording the parties an opportunity to address it, we have chosen to deviate from that practice in this case because we are satisfied that *Strickland,* which we decided approximately one and one-half years ago, cannot be distinguished from this case. Moreover, for whatever reasons, we did not hear oral argument in this case until the defendant had completed approximately three quarters of his three year prison sentence. In light of our holding in *Strickland,* any further delay in the resolution of this appeal simply cannot be justified.

[1] By the time we entered our order of release, Marlik had been incarcerated for more than 800 days.

247 Conn. 634, 635, 723 A.2d 316 (1999). We all agreed that "it [was] necessary that [Marlik's] incarceration be terminated immediately . . . ."[2] Id. Unfortunately, however, my colleagues are unwilling to address the real injustice that lies at the heart of this case. Instead, they have decided this appeal on a technicality. This disposition will once again fuel the perception among members of the African-American community that our system of criminal justice is stacked against them. See, e.g., *State* v. *Hodge*, 248 Conn. 207, 269–74, 726 A.2d 531 (1999) (*Berdon, J.*, dissenting) (observing, inter alia, that "conventional wisdom among African-Americans and other minorities is that they are not treated fairly throughout our judicial system because of their race"); Connecticut Judicial Branch, Statewide Public Trust and Confidence Study (October, 1998) p. 17 (finding that 45.5 percent of Connecticut residents polled believe that "Connecticut courts discriminate against minorities").

The trial court revoked Marlik's probation for no reason other than this: he had a habit of sleeping late and, as a consequence, was often tardy for school.[3] As her son was led away to prison, Marlik's mother speculated that the trial court's sentence was racially motivated. Although there is absolutely no evidence in the record to support such a conclusion, it is clear that Marlik's mother believed it.[4] Moreover, it is all too easy

---

[2] Although the interim per curiam opinion, which I joined, focused on the "dispositional phase of the probation revocation proceeding"; *State* v. *Mourning*, supra, 247 Conn. 635; I now conclude for the reasons set forth in this dissent that Marlik is entitled to a new hearing on whether he wilfully violated his probation. See footnote 10 of this dissent.

[3] In its original opinion released on June 8, 1999, the majority conceded that "[t]he state relied *solely* on [Marlik's] tardiness to support its claim that [he] had violated the conditions of his probation." (Emphasis added.) The clairvoyant majority, in an amendment to its original published opinion, now claims that "the state also relied on [Marlik's] [two] unexcused absences and suspension from school" (based on Marlik's purchase of a soda off school grounds), notwithstanding the failure of the state to advance those claims in its argument before the trial court. See footnote 8 of the majority opinion.

[4] The majority states that "[t]his case is not about discrimination, and no such allegation ever has been raised by [Marlik] or defense counsel . . . ." This statement simply misses the point. It is technically true that Marlik did

to imagine that other members of the African-American community, upon learning of the circumstances surrounding Marlik's incarceration, would reach a similar conclusion. Marlik's mother also repeatedly emphasized that the court's ruling was "unfair." With this I agree. To rephrase this agreement in the language of legal discourse, I believe that the trial court abused its discretion by revoking Marlik's probation and imposing the sentence that it did.

Before turning to the merits of this case, it is necessary to address the fact that the majority decides this case on the technicality that Marlik was deprived of his right of allocution. This issue was never argued by Marlik; was never considered—let alone decided—by the Appellate Court; and has nothing to do with the issue that we certified.[5] See footnote 21 of the majority opinion. Perhaps most importantly, this issue has absolutely nothing to do with the outcome in this case. While I agree that the trial court committed a serious error by

not allege that he was the victim of discrimination; because he was denied his right of allocution, he had no opportunity to do so. It is also technically true that defense counsel did not advance this argument. The whole truth, however, is that Marlik's mother articulated with unambiguous clarity her opinion that the trial court imposed a draconian sentence upon her child because he was African-American. Far from feeling any desire to "[inject] the specter of racial discrimination into this case," I simply feel it is my obligation to report the statements that Marlik's mother made. On the record and in open court, Marlik's mother expressed her belief that the trial court was swayed by two invidious facts: (1) Marlik is African-American; and (2) the alleged victim of the underlying offense is white. Under the circumstances of this case, we simply cannot ignore this belief, which echoes those held by nearly one half of the respondents to the recent Statewide Public Trust and Confidence Study, supra. In my view, the trial court abused its discretion by failing to make any effort to dispel the appearance of injustice.

[5] We granted certification limited to the following issue: "Under the circumstances of this case, did the trial court abuse its discretion by revoking [Marlik's] probation of a conviction as a youthful offender and by sentencing [him] to imprisonment?" *State* v. *Mourning*, 244 Conn. 924, 714 A.2d 11 (1998). It is apparent that this question has nothing to do with depriving Marlik of his right of allocution.

depriving Marlik of his right of allocution, the transcript strongly suggests that there was nothing Marlik possibly could have said that would have changed the order of the trial court. See the excerpts from the colloquy between Marlik and the court that occurred at the end of the violation of probation hearing, which is set forth later in this dissent. Significantly, this is not a case in which the trial court simply forgot to ask Marlik whether he wished to be heard. In this case, Marlik repeatedly implored the court to listen to him. Again and again, the trial court refused these requests.

I now turn to the issue that this case is actually about. In order to fully understand the abuse of discretion in this case (and the grave accusation that Marlik's mother leveled against the trial court), I find it necessary to discuss the facts underlying Marlik's initial conviction as a youthful offender.[6] At approximately 5:30 on the morning of June 7, 1995, an African-American man allegedly groped a 200 pound white woman while she sat on the front steps of her house and smoked a cigarette. Several hours later, a police officer drove the complainant around the area of the assault in an effort to find the assailant. During this drive, the complainant was inattentive, as she had had only four hours of sleep the night before. The officer pointed to Marlik, who was walking toward his school bus, and asked the complainant if he was the assailant. She responded in the affirmative. At a bench trial before the same judge who ultimately revoked Marlik's probation, the complainant once again identified Marlik as the assailant.

The assault occurred during the darkness of 5:30 in the morning, and the complainant had not been wearing her glasses. Nevertheless, the complainant provided the

---

[6] Based upon the record before us, there is a substantial doubt in my mind that Marlik committed the underlying offense. Nevertheless, I realize that this concern lies outside the scope of the question that is before the court. See footnote 5 of this dissent.

police with a detailed description of her assailant before she identified Marlik on the morning of the assault. According to this description, the assailant bears little resemblance to Marlik, except that they are both African-American. The complainant told the police that the assailant had a medium black skin tone, big round eyes, and a medium build. None of these details describes Marlik, who has very dark skin, almond-shaped eyes, and a slender build. In addition, Marlik's clothing was completely different from the clothing worn by the assailant. Moreover, Marlik was sixteen years old at the time of his arrest, and the complainant stated that her assailant was between eighteen and twenty years old. The complainant's in-court identification was not corroborated by any other evidence.

Marlik presented a defense of mistaken identity. More specifically, he testified that he had overslept on the morning of the alleged assault. As we know, Marlik had a habit of oversleeping. Marlik testified that he was in bed, fast asleep, at 5:30 on the morning of the assault. His uncle corroborated this account. William Curtis, the director of a Danbury youth center, testified that Marlik is not an aggressive person and has no history of committing sexual assault or any similar offense.

Marlik's case was both simple and compelling: (1) it was dark at the time of the assault; (2) the complainant was not wearing her glasses at the time of the assault; (3) Marlik was asleep at the time of the assault; and (4) the initial description of the assailant did not describe Marlik. Despite these evidentiary difficulties, the trial court found Marlik guilty of sexual assault in the third degree. In order to rationalize this judgment, the trial court relied upon an inculpatory fact that had no evidentiary foundation: it announced that the complainant saw the assailant's face when he used a match to light a cigarette. Although the complainant testified that the assailant smoked a cigarette, there was not a shred of

evidence before the trial court that tended to suggest that the complainant ever got a good look at his face.

The following colloquy took place at the sentencing:

"[Marlik's Mother]: . . . [The assailant] was not my son. The whole description of the person is not my son, but there is nothing I could do about it.

"The Court: . . . The court heard the evidence and made a decision on whether it believed your son—it didn't. . . .

"[Marlik's Mother]: [I]t's not my son and it's totally a whole different description—

"The Court: As far as this proceeding is concerned, it's your son, he's been convicted of it.

"[Marlik's Mother]: Yeah, but in reality, that's not right—

"The Court: Reality aside, he is the person who did it as far as this court is concerned—

"[Marlik's Mother]: Yeah.

"The Court:—and there will be no more discussion about that—that's over.

\* \* \*

"[Marlik's Attorney]: . . . [N]othing's to be gained by putting him in jail . . . .

"The Court: Counselor, I've heard that all my life; nothing is to be gained from it. What's to be lost by it? Take him off the street where he can't get into—do any more harm.

"[Marlik's Attorney]: [Probation will] force him to follow the rules.

"The Court: It's going to postpone the inevitable, that's all it's going to do.

* * *

"I don't care. I'll give you one chance. You're not going to make it, I don't think.

* * *

"Now, don't come back in here, again, ever, and tell me that your son didn't get an opportunity. He's getting an opportunity now. If he throws it away, it's his fault, not ours.

* * *

"Nobody makes [Marlik] do anything except what he wants to do when he wants to do it.

"[Marlik's Mother]: Believe me, I try. I do try. I'm not easy on him. I try.

"The Court: Well, it hasn't been too successful, let's put it that way."

The trial court sentenced Marlik to a prison term of three years as a youthful offender, suspended the sentence, and placed him on probation.

Before being placed on probation, Marlik had been absent from school sixty times, tardy fifty-nine times, and suspended six times. While on probation, Marlik followed a sharp upward trajectory of improvement. He was absent only twice; each time, he was in bed with the flu. He was suspended only once, for leaving school grounds during recess to buy a can of soda from a nearby store.[7] I recognize that Marlik was often tardy. He was tardy because he habitually overslept.

---

[7] There is no evidence in the record suggesting that Marlik knew that his errand constituted an infraction of school rules.

After he had been on probation for five months, Marlik was arrested on a warrant that was issued because he had violated the terms of his probation by being late to school. During his probation, Marlik had become substantially more diligent about his studies. It is apparent to me that probation—as opposed to incarceration—promoted the best interests of Marlik, the best interests of society, and the interests of justice. Recognizing this fact, Shaun Ratchford, the director of a program for students needing academic assistance in which Marlik was enrolled, offered his "strong recommendation that violation of Marlik's probation *[should] not result in incarceration . . . .*" (Emphasis in original.) The complainant from the underlying offense joined in this recommendation.

Although Marlik was arrested for violating the terms of his probation on May 9, 1996, a special public defender was not appointed to represent him until September 12, 1996[8]. Apparently, the trial court continued the case multiple times during the intervening four months. Just six days after she was finally appointed, Marlik's attorney sought to retain a psychologist—at the state's expense—to evaluate Marlik.[9] Marlik's attorney intended to present

---

[8] Although an undated appearance form was filed by an attorney from the public defender's office on behalf of Marlik, that attorney did not represent him because of a conflict of interest. The conflict was based on the fact that the public defender's office previously had represented Marlik's accuser who herself had a prior criminal case that had resulted in a conviction. A special public defender was not appointed as trial counsel until September 12, 1996.

[9] Trial counsel for Marlik pointed out before the Appellate Court: "The next day [after appointment of trial counsel for Marlik on September 12, 1996] I had contacted the doctor to find out the cost and whether an evaluation could be done. On [September 18] I put in the request for funds, which was granted on October 1. And between October 1 and October 17, I managed to get at least one appointment in with the doctor. So I did indicate to the [trial] judge at the beginning, 'this is what I've done. . . . And we just haven't had time to get it finished because we had to go through the public defender's office and get the funds.' And that was why I was requesting a continuance so that I could have that evidence to present. And the [trial] judge did not permit that. He precluded me from presenting evidence that would support our proposition that [Marlik] was still receiving the . . . benefits of probation and that probation should be continued."

the results in his defense at the hearing on the violation of his probation. Marlik met with the psychologist for the first time on October 8, 1996, for a ninety minute appointment.[10] Additional appointments were scheduled for October 21 and October 28.

The same trial judge who had convicted and sentenced Marlik conducted a probation violation hearing on October 17, 1996—a few days before Marlik's second scheduled appointment and just more than one week before his third and final scheduled appointment. Marlik's attorney sought a continuance because the psychologist had not yet completed her evaluation. The trial court's sole response to this request was to ask "Is there anything else?" and—upon being told that there was not—informed the sheriff that "[Marlik is] remanded to custody . . . ." For all intents and purposes, the trial court ignored the public defender's request for a continuance. In so doing, the trial court clearly acted upon its sense that "the probation system [has] become a joke" and that "[w]e're continuing cases . . . until they go out of style." While it is true that four months elapsed between the time when Marlik was arrested for violating his probation, it is apparent that this delay was not Marlik's fault.[11] More to the point, whether or not there is any merit to the trial court's obvious frustration, the court should not have sought catharsis by depriving a sixteen year old of his liberty.

In my view, the trial court abused its discretion by refusing to consider the psychologist's report before (1) finding that Marlik had violated his probation and (2) sentencing him to spend three years of his life behind bars. The majority counters that Marlik "has failed to demonstrate how the psychiatric evaluation possibly could have had any bearing on the court's finding of a

---

[10] The evaluation was delayed until early October because it took a considerable amount of time to obtain approval for the funds used to retain the psychologist. See footnote 12 of the majority opinion.

[11] As discussed previously, Marlik's attorney sought to retain a psychologist just six days after she was appointed. See footnote 9 of this dissent.

violation." This assertion is silly. If the psychologist's report had demonstrated that Marlik's tardiness was attributable to psychological difficulties that were beyond his control, then of course this evidence would have been relevant to the issue of wilfulness.[12] Equally important, the psychologist could have testified as to (1) whether incarceration held any promise of contributing to Marlik's rehabilitation and (2) whether Marlik represented a threat to any members of the community. Accordingly, even if the trial court had found a wilful violation after considering the psychological evaluation, the psychologist's testimony might have enabled the court to realize that sentencing a sixteen year old to spend three months in jail for each of the twelve times that he was late for class was so grotesquely disproportionate as to constitute an abuse of discretion.

The following colloquy took place at the end of the trial court's hearing on Marlik's violation of the terms of his probation:

"The Court: . . . The court is tired of people who abuse the violation of probation—the probation system [has] become a joke. We're continuing cases on here until they go out of style . . . .

"[Marlik is] ordered committed to the custody of the commission[er] of correction . . . .

"[Marlik's Attorney]: Your Honor, I'd like to be heard on sentencing. I didn't have any opportunity to be heard

---

[12] The trial court was required to make an inquiry "into the reasons for the failure to obey the conditions of probation and an assessment . . . as to whether those reasons fall into the category of willful disobedience of the court's sentence . . . . See *Bearden* v. *Georgia*, 461 U.S. 660, 103 S. Ct. 2064, 76 L. Ed. 2d 221 (1983)." *State* v. *Cooley*, 3 Conn. App. 410, 414, 488 A.2d 1283, cert. denied, 196 Conn. 805, 492 A.2d 1241 (1985).

Furthermore, the majority's claim of irrelevance disregards the fact that the trial court authorized the expenditure of $1000 of the state's funds in order to conduct a psychological evaluation of Marlik. Clearly, the trial court believed at one point that such an evaluation might have some bearing upon its deliberations. Having made such a determination, I believe that the trial court abused its discretion by revoking Marlik's probation just days before the state-sponsored evaluation was scheduled to have been completed.

on sentencing after you found the violation of probation.

"The Court: Go ahead.

"[Marlik's Attorney]: . . . [T]he school recommends that he not be incarcerated, but [rather] placed in a residential placement. . . . I think that ought to be considered by the court and that we have time to complete the [psychological] evaluation and find an appropriate residential placement for [Marlik].

"The Court: Is there anything else? Is there anything else?

"[Marlik's Attorney]: No, Your Honor.

"The Court: He's remanded to custody, Sheriff. . . .

"[Marlik]: Your Honor, I'm trying.

"The Court: He's remanded to custody, that's the end of it. Now.

"[Marlik]: Your Honor, I'll start going to school.

"[Marlik's Mother]: Your Honor, [he's getting] railroad[ed] . . . .

"[Marlik]: Your Honor, can I please talk to you—

"[Marlik's Mother]: If I would have known this was going to [happen], I would have had witnesses here to talk in my son's favor. You didn't even allow him that.

"[Marlik]: Your Honor, please. Please.

"[Marlik's Mother]: He's not a bad kid. He'll change, Your Honor, but you don't even give us a chance to prove it.

"[Marlik]: Your Honor, I just want to—I just want to—

"[Marlik's Mother]: He did not commit that crime.

"The Court: Sheriff. You [are] remanded to custody. Go. . . .

"[Marlik's Mother]: If he was a white kid, he wouldn't be—

"[Marlik]: [I've been] trying since I got out last time, [I've been] doing good. I go to school, I'll look for a job, Your Honor.

"[Marlik's Mother]: He didn't rape no white woman.

"[Marlik]: Your Honor, can I please talk to you please. Talk to me, please. I want to talk to you—

"[Marlik's Mother]: It's not fair to my son.

"[Marlik]: Please, Your Honor.

"[Marlik's Mother]: You're not fair to my son.

"The Court: Your son has been given every opportunity, I told you that at the sentencing.

"[Marlik's Mother]: No, it's not fair.

"The Court: And I told you that at the sentencing.

"[Marlik's Mother]: No, it's not fair.

"The Court: I've heard you before.

"[Marlik's Mother]: It's not fair.

"The Court: There was no—

"[Marlik's Mother]: It's not fair.

"The Court: There was no attempt to have you heard this time.

"[Marlik's Mother]: No, you railroad[ed] and hurt my child.

"The Court: That's all."

More than 800 days of Marlik's life have been irretrievably lost to the horrors of prison. Unfortunately, I have no power to undo that.[13] Because it is all that I can do,

---

[13] In my view, the state has an obligation to make appropriate professional services available to Marlik, in an effort to (1) address the trauma caused by his incarceration and (2) compensate for any education that he may have missed.

I dissent from the majority's conclusion that the trial court did not abuse its discretion by revoking Marlik's probation, thus sentencing a sixteen year old to spend three months in prison for each of the twelve times that he overslept.